IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL ACTION |
| | : |
| v. | : NO.  24-141 |
| | : |
| JOSE VALENTIN | : |

**MEMORANDUM**

**MURPHY, J.**                                                                                                           February 3, 2026

     Officers pulled Jose Valentin over for a traffic stop.  One thing led to another, and before long, Mr. Valentin was under arrest in the back of a patrol car, answering questions about whether he knew about the gun that had been under his seat.  It started with tinted windows and an expired registration.  Then, based on Mr. Valentin's conduct and other factors, the officers decided to frisk him and the area within his reach.  They found an empty gun holster on the front passenger seat and, upon searching further, a firearm under the driver's seat.  The officers arrested him and put him in the back of the patrol car, where he was feeling chatty.  And while the officers drove Mr. Valentin to the police station, the officers talked to him about the gun, the holster, and the possible legal theory for the crime ultimately charged.  Mr. Valentin seeks to suppress all evidence seized from the vehicle pursuant to the traffic stop, as well as two sets of statements he made to the officers while under arrest.  We held an evidentiary suppression hearing, heard from the officers, and watched the body-camera footage.  All in all, the officers had good reasons for everything they did, but they should have Mirandized Mr. Valentin before quizzing him about the gun.  We deny Mr. Valentin's motion with respect to the evidence seized and his statements made to Officer Lane while the officer was fitting the gun into the holster, but we grant Mr. Valentin's motion with respect to his statements made to the officers immediately before, and during, his transport to the police station.

I.      **FINDINGS OF FACT**

On April 9, 2024, Jose Valentin was indicted under 18 U.S.C. §§ 922(g) and (e) for the possession of a firearm by a felon. DI 1-1 at 1. This indictment stems from a traffic stop on October 2, 2023, which resulted in Mr. Valentin's arrest. DI 42 at 1; DI 45 at 1. We held a hearing (DI 39) on Mr. Valentin's suppression motion (DI 32) on December 3, 2025, during which we received credible testimony and viewed body-camera footage. We find as follows.

While on routine patrol in the 2900 Fairhill Street area of Philadelphia, uniformed Philadelphia Police Officers Edward Lane and Brendan McCauley observed a vehicle with an extremely dark window tint. DI 40 at 6-12; 60-61. Upon running the vehicle's tag, the officers learned that Mr. Valentin's tag was listed as being in "suspension/revocation" status due to the cancellation of insurance. *Id.* at 11-12; 61-62. The officers activated their patrol car lights and sirens to initiate a traffic stop while Mr. Valentin parked the vehicle. *Id.* at 12-13; 62-63. Officer Lane approached the driver's side, while Officer McCauley approached the passenger's side. *Id.* at 13; 63. While approaching, the officers, who could not see into the vehicle due to the tinting, asked Mr. Valentin to roll down all four windows of the car; Mr. Valentin rolled down three of the four windows fully but only rolled down the front passenger window by approximately four inches. *Id.* at 13-15; 56-57; 63-65. Upon approaching the car, the officers saw a young child in the backseat. *Id.* at 15; 66.

As Officer Lane approached the driver's side door, Mr. Valentin opened the door and started moving to exit the vehicle, prompting Officer Lane to ask Mr. Valentin to remain seated in the car. *Id.* at 16; 65. Officer Lane asked Mr. Valentin for his license and registration, which Mr. Valentin handed over. *Id.* at 50-51; 55; 66. He then asked Mr. Valentin whether he had any

weapons in the vehicle or on his person, to which Mr. Valentin replied he did not but then grabbed at his left pocket, from which he pulled out a wrapped wad of cash. *Id.* at 17-20. According to Officer Lane, Mr. Valentin exhibited various nervous behaviors, such as (1) trying to exit the car during the traffic stop; (2) breathing heavily; (3) shaking his leg and hands; (4) pulling out a wad of cash; and (5) flashing a fake police badge and jokingly pretending to be a cop, after Officer Lane asked if he had a license to carry a firearm. *Id.* at 16-20. Officer Lane then asked Mr. Valentin to exit the vehicle so that he could frisk him, to which Mr. Valentin stated, "[H]ell yeah, do your thing." *Id.* at 20-22.

While Officer Lane frisked Mr. Valentin, Officer McCauley was looking through the front passenger window and could hear Officer Lane talking to Mr. Valentin, which included Officer Lane "saying something about [Mr. Valentin] being nervous . . . [and] shaking." *Id.* at 67. Officer McCauley also observed Mr. Valentin try to get out of the car, fail to fully roll down all the windows, flash a fake police badge and joke that he was a cop, and seemingly admit that he was nervous. *Id.* at 67-68. Once Officer Lane asked to frisk Mr. Valentin, Officer McCauley immediately opened the passenger door for a safety frisk. *Id.* at 68-69. He immediately saw a sweatshirt and money on the seat, and upon picking up the sweatshirt, he saw an empty, black nylon gun holster underneath the sweatshirt. *Id.* at 69. At this point, Officer McCauley walked around the back of the vehicle, asked Mr. Valentin if he had a firearm in the car or "if he [had] anything dumb in the car[,]" and told Mr. Valentin that he was going to detain him. *Id.* at 70-71. This prompted Officer Lane to handcuff Mr. Valentin. *Id.* at 23. Officer McCauley stated that there was a holster in the passenger seat, which Mr. Valentin claimed was fake. *Id.* at 23-24; 70. Officer Lane immediately then looked under the driver's seat and observed a black handgun

3

underneath the seat. *Id.* at 24-25; 28; 71-72. The officers then put Mr. Valentin in the rear of the police vehicle. *Id.* at 25; 72.

After that, Officer Lane secured Mr. Valentin's vehicle and went to the trunk of the patrol car with the gun and the holster. *Id.* at 27-29. Mr. Valentin, who remained seated in the back of the patrol car, looked toward Officer Lane and stated that the holster was "dusty" and had been there forever. *Id.* at 29; 77-78. Officer Lane then put the gun and holster together to see if they would fit, *id.* at 29-30, remarking "[L]et's see Cinderella, let's see Cinderella."[1] The gun fit the holster. *Id.* at 29.

Officer McCauley then sat in the front passenger seat of the patrol car; however, at this point, his body-worn camera was off. *Id.* at 77-78. Though Officer McCauley did not recall at the suppression hearing how the following interaction began, Officer Lane's body-worn camera footage depicts the following exchange between the officers and Mr. Valentin:

> Officer McCauley: "When you get shot?"
> Defendant: [unintelligible]
> Officer McCauley: "That's why you're carrying a gun, I get it, I get it." Defendant: "I got shot [unintelligible]."
> Officer McCauley: "What?"
> Defendant: "[unintelligible] in my car when I got shot [unintelligible]."
> Officer McCauley: "So that makes that makes sense why you, you are carrying a gun."
> Defendant: "I don't, I don't I don't do guns, I do drugs."
> Officer McCauley: "You do do guns cause you just had one in your [unintelligible], and you had a holster in your fucking front seat, that that was, that's what might get ya, that's what might get ya, I'll be honest with you. That

---

[1] We reviewed Officer Lane's body-worn camera footage during the suppression hearing, which contained these statements by Officer Lane. G-1 at 27:53-28:17.

> holster on the front seat, that's what might get ya."
> Officer Lane: "Constructive possession."
> Officer McCauley: "Constructive possession bro you had it right."
> Defendant: "Explain it to me [unintelligible]."
> Officer McCauley: "Bro you had it."
> Officer Lane: "Sorry, your lawyer will explain it to you."
> Officer McCauley: "Yeah, I mean, Shaka will explain it to you."
> Defendant: "No no no saying you saying [unintelligible] front seat the the the holster right."
> Officer McCauley: "Yeah you obviously took the gun out and then had it hidden underneath the seat."
> Defendant: "It must have been there today."
> Officer McCauley: "Stop it."
> Defendant: "I promise you."
> Officer McCauley: "Stop it."
> Defendant: "I don't, listen I don't touch that gun."
> Officer McCauley: "You just keep it there for safety."
> Defendant: "I just keep it there just in case I get shot again and I can and I can protect myself I will hell yeah."
> Officer McCauley: "O.K."
> Defendant: "This is Philly bro, motherfuckers get shot for no reason. This is Philly motherfuckers getting shot for no reason.

G-1 at 35:02-36:23.[2]

## II.     MOTION AT ISSUE

Following the December 3rd suppression hearing, in which we heard argument on Mr. Valentin's first suppression motion (DI 32) and the government's response in opposition (DI 37) — and during which we heard testimony and watched body-camera footage from Officers Lane and McCauley — the parties submitted post-hearing briefing. DI 42; DI 45. In Mr. Valentin's post-hearing suppression motion (DI 42), he withdraws his motion to suppress the DNA samples taken from him and the recovered firearm (DI 32); however, he maintains his suppression challenges to (1) the evidence obtained from the car he was driving; and (2) his statements made

---

[2] G-1 refers to the body-camera footage from Officer Lane's body camera, which we reviewed during the suppression hearing and have since reviewed further.

5

while in custody. DI 42 at 1, 6-10. Mr. Valentin concedes that the officers had valid reasons for investigating his vehicle, to the extent that we believe the officers' testimony that they stopped the vehicle because of the dark window tint and suspended registration. *Id.* at 6. But from Mr. Valentin's perspective, the officers did not have reasonable suspicion to frisk him nor the vehicle because the totality of the circumstances did not indicate that he was armed and dangerous. *Id.* at 6-7. He highlights that (1) he fully cooperated with the officers' commands and questions; (2) there was no testimony that contraband was in plain view before Officer Lane conducted the frisk of Mr. Valentin; and (3) Officer Lane testified that the officers were on a "Crime Plan" patrol, in which they sought to get guns off the street. *Id.* Mr. Valentin further asserts that Officer McCauley searched the front passenger seat without reasonable suspicion or probable cause to do so, and that, when Mr. Valentin was handcuffed, he was neither (1) under arrest, as no illegality had occurred at that point; nor (2) "unsecured" such that the officers needed to frisk the passenger compartment of the car. *Id.* at 8.

     Mr. Valentin also urges us to suppress the statements he made while in the back of the patrol car to (1) Officer Lane, when the officer was fitting the gun into the holster; and (2) to both officers immediately before, and during, his transport to the police station. *Id.* at 8-10. Mr. Valentin avers that his statements occurred "as the result of a custodial interrogation without Miranda warnings" because the officers' statements were "clearly intended to elicit incriminating responses from [him]." *Id.* at 8-9. Though he acknowledges that he initiated his conversation with Officer Lane while the officer was placing the gun in the holster, Mr. Valentin maintains that Officer Lane's statement, "[L]et's see Cinderella, let's see Cinderalla" was meant to elicit an incriminating response. *Id.* at 10. Regarding his conversation with both officers, Mr. Valentin

asserts that both officers "engaged in a back[-]and[-]forth conversation with [him] that was clearly intended to lead to incriminating responses by [him,]" as exhibited by (1) Officer McCauley's statements to Mr. Valentin regarding why he carried a gun; (2) both officers' use of the term "constructive possession" in an apparent effort to explain to him why he was guilty; and (3) Officer McCauley's statements about what Mr. Valentin did with the gun. *Id.* at 9.

The government argues suppression is unwarranted because the officers' actions were justified first by reasonable suspicion, then by probable cause. DI 37 at 3; DI 45.[3] After noting that the officers observed two motor vehicle code violations before stopping Mr. Valentin's car — an invalid license tag and excessively tinted windows — the government argues that the officers subsequently developed reasonable suspicion that Mr. Valentin was armed and dangerous based on several factors. DI 37 at 3; DI 45 at 6. Specifically, the government points to (1) the stop's occurrence in a high-crime area; (2) Mr. Valentin's furtive movements; (3) Mr. Valentin's multiple signs of nervousness and bizarre behavior, which included showing a wad of cash, pretending to be a police officer, grabbing his pocket, and opening the door; and (4) the officers' combined 22 years of experience (a) working in this district and (b) recovering numerous illegal firearms during traffic and pedestrian stops in high-crime areas. DI 37 at 3, 9-10; DI 45 at 6-8. The government contends that, when Officer Lane frisked Mr. Valentin, the sweatshirt on the front passenger seat was within arm's length of the driver's seat (*i.e.*, it was easily accessible if the officers let Mr. Valentin return to the car), so their frisk of the seat was justified under *Terry*. DI 37 at 12-13; DI 45 at 8 (citation omitted). In its view, the discovery of

---

[3] The government incorporates its initial response in opposition (DI 37) by reference in its supplemental opposition brief (DI 45).

the holster, in combination with the holster's placement next to a pile of cash and all the factors supporting reasonable suspicion, gave the officers probable cause to believe evidence of a crime would be found in the car, such that they were justified in searching the rest of the car. DI 37 at 5, 13; DI 45 at 8 n.6. As for Mr. Valentin's statements, the government insists that Mr. Valentin was not interrogated in the police car but that, instead, he volunteered information about the gun and the holster "in an attempt to spin the facts to his liking." DI 37 at 17; DI 45 at 9-10.

### III. LEGAL STANDARDS

Generally, the defendant seeking to suppress evidence carries the burden of proof. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). But once the defendant establishes a basis for his motion — for example, that the search or seizure was warrantless — the burden then shifts to the government to demonstrate that the search or seizure was reasonable. *Id.* (citation omitted).

#### A. Search and seizure claims

The Fourth Amendment enshrines "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." Two standards often come into play when evaluating whether a search or seizure was unreasonable: reasonable suspicion and probable cause. Reasonable suspicion is a less demanding standard compared to probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted). A law enforcement officer has reasonable suspicion to conduct a limited search and seizure when he "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In such circumstances — and so

long as the officer identified himself as a policeman, made reasonable inquiries, and despite this maintained a reasonable fear for the safety of himself or others — the officer may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id*.  In such situations, the search is reasonable under the Fourth Amendment and the prosecution may introduce the evidence seized against the individual from whom it was obtained. *Id.* at 31.  To satisfy the reasonable suspicion standard, the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.  This requires "more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Wardlow*, 528 U.S. at 124 (citation modified) (citation omitted).

We determine the existence of reasonable suspicion based on commonsense inferences and judgments regarding human behavior. *Id.* at 125 (citation omitted).  In doing so, we examine "the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation modified).  There must be "some minimal level of objective justification" for conducting the stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation omitted).  An individual's "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124 (citations omitted).

In the context of a traffic stop, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."

9

*Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977) (per curiam).[4]  Recognizing that investigative detentions involving suspects in cars "are especially fraught with danger to police officers[,]" officers may order individuals to exit the vehicle during a traffic stop and frisk them if the officers have a reasonable belief that they are armed and dangerous.  *Michigan v. Long*, 463 U.S. 1032, 1047-48 (1983).[5]  "[W]hen an arrest is made, it is reasonable for the arresting officer to search the arrestee's person and the area within his immediate control . . . mean[ing] the area from within which he might gain possession of a weapon or destructible evidence." *Long*, 463 U.S. at 1048 (citation modified) (citation omitted).  "[A]rticles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within the area into which an arrestee might reach in order to grab a weapon." *Id.* at 1049 (citation modified) (citation omitted).  Thus, "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which,

---

[4] In *Mimms*, two officers observed the defendant driving a car with an expired license plate, so they stopped the car to issue a traffic summons. *Mimms*, 434 U.S. at 107.  Upon approaching and asking the defendant to step out of the car and produce his owner's card and operator's license, the officer noticed a large bulge under the defendant's jacket, so the officer frisked him and discovered a revolver on his person. *Id.*  The Court answered the narrow question of whether the officer could justifiably order the defendant out of the car, which the Court determined was only a *de minimis* additional intrusion on the defendant's liberty. *Id.* at 111.  It then addressed whether the frisk of the defendant for weapons after the officer observed the bulge in his jacket was justified, which the Court answered in the affirmative. *Id.* at 111-12.

[5] In *Long*, the officers permissibly took "preventive measures to ensure that there were no other weapons within Long's immediate grasp before permitting him to reenter his automobile." *Long*, 463 U.S. at 1051.  The Court explained that "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1051-52.  "Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons." *Id.* at 1052.

taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* (citation modified) (citation omitted).

As for probable cause, an officer possesses probable cause to conduct a search or seizure "when the facts available to [him] would warrant a [person] of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (citation modified) (citations omitted). We look to the totality of the circumstances when evaluating the existence of probable cause, as probable cause is "a fluid concept[.]" *Id.* at 244 (citation omitted).

Finally, a search is reasonable if it is conducted consensually. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). When assessing whether an individual consented to a search, we ask, "[W]hat would the typical reasonable person have understood by the exchange between the officer and that suspect?" *Id.* at 251 (citations omitted). The consent must be voluntary, and we determine voluntariness by evaluating the "totality of the circumstances" — including (1) the setting in which consent occurred; (2) the verbal and non-verbal actions of the parties; and (3) the consenting party's age, educational background, and intelligence. *United States ex rel. Harris v. Hendricks*, 423 F.2d 1096, 1098-99 (1970). Officers need not "always inform detainees that they are free to go before a consent to search may be deemed voluntary[,]" *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996), and "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976).

**B.** *Miranda* **claims**

11

Prior to subjecting a person in custody to interrogation, law enforcement must first inform him "in clear and unequivocal terms that he has the right to remain silent." *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). *Miranda*, which safeguards an individual's Fifth Amendment rights, applies both to (1) "express questioning" and (2) "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (footnotes omitted). As for the second category, what matters is the suspect's perception, not law enforcement's intent. *Id.* at 301. However, law enforcement are not required to "stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make" because "[v]olunteered statements of any kind are not barred by the Fifth Amendment[.]" *Miranda*, 384 U.S. at 478 (citation omitted).

## IV. DISCUSSION

**A.  The officers had probable cause to conduct a traffic stop of Mr. Valentin, reasonable suspicion to frisk Mr. Valentin and the front passenger seat, and probable cause to search underneath the driver's seat**

As a threshold matter, the officers' initial traffic stop of Mr. Valentin was constitutional because, at the time they conducted the stop, the officers had probable cause to suspect that Mr. Valentin had committed two motor vehicle code violations: (1) illegal window tinting;[6] and (2)

---

[6] Subject to certain exceptions not applicable here, 75 Pa. C.S. § 4524(e)(1) makes it unlawful to "drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle."

driving with a suspended or revoked vehicle tag.[7]

Once the officers approached Mr. Valentin, we find that they had reasonable suspicion to frisk Mr. Valentin's person and his immediate surroundings — which included the front passenger seat. We reach this conclusion based on Mr. Valentin's (1) partial rolling down of the front passenger window, despite fully rolling down all other windows per the officers' request; (2) furtive movements, including his attempt to get out of the car; (3) nervous behavior, including his heavy breathing and shaking leg and hands; (4) quick check of his pants' pocket after Officer Lane asked if he had any weapons on him or in the car; (5) wad of cash in his pocket; and (6) joking flash of his fake police identification badge. We also consider as relevant the officers' experience and training involving traffic stops, as well as their knowledge of the area in which the stop occurred as a high-crime area known for drug activity. Considered in their totality, we find that these "specific and articulable facts" led the officers "reasonably to conclude . . . that criminal activity may [have been] afoot and that [Mr. Valentin] may [have been] armed and presently dangerous." *Terry*, 392 U.S. at 21, 30; *Long*, 463 U.S. at 1049.

The officers thus were permitted to frisk Mr. Valentin's person,[8] as well as "the area within his immediate control" — *i.e.*, the front passenger seat. *Long*, 463 U.S. at 1048 (citation modified) (citation omitted). Indeed, Mr. Valentin was not under arrest when Officer McCauley

---

[7] 75 Pa. C.S. § 1371(a) makes it unlawful to "operate[] upon any highway a vehicle the registration of which has been suspended."

[8] Notably, Officer Lane's frisk of Mr. Valentin was "carefully limited" to Mr. Valentin's "outer clothing" and clearly aimed at discovering weapons on Mr. Valentin's person. *Terry*, 392 U.S. at 30-31. Moreover, Mr. Valentin validly consented to the search of his person when, in response to Officer Lane asking to frisk him, Mr. Valentin told Officer Lane, "[H]ell yeah, do your thing." DI 40 at 20-22.

13

searched beneath the sweatshirt on the front passenger seat, so the gun (which was underneath the sweatshirt) would have been within Mr. Valentin's reach had he been permitted to reenter the car. This is the exact concern the *Long* Court addressed when it concluded that officers could take "preventive measures to ensure that there were no other weapons within [the individual's] immediate grasp before permitting him to reenter his automobile." *Id.* at 1051.

Once Officer McCauley discovered the empty gun holster underneath the sweatshirt, which also was next to a wad of cash, the officers' reasonable suspicion that criminal activity was afoot transformed into probable cause that evidence of a crime would be found in the car. These two observations, in combination with the aforementioned factors that supported reasonable suspicion and Mr. Valentin's claim that he did not have a weapon on him nor in the car, nor a license to carry such a weapon, established probable cause to search underneath the driver's seat.[9] Additionally, because at this point Mr. Valentin was lawfully arrested (based on the probable cause that he possessed a firearm without a license), the search under the driver's seat was lawfully conducted as a search incident to arrest. *Arizona v. Gant*, 556 U.S. 332, 335 (2009) (holding that "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."). Given the above, it was reasonable to conclude that evidence related to a firearms offense would be found in the vehicle. These searches were constitutional.

**B.    Mr. Valentin's statements made immediately before and during his transport to the police station are suppressed because they were obtained in violation of *Miranda***

---

[9] Mr. Valentin also seemingly consented to this search; when Officer McCauley asked Mr. Valentin whether there were any firearms in the car or if there was anything "dumb in the car[,]" Mr. Valentin replied, "You can check[.]" GI-1 at 11:24-11:37. Mr. Valentin's custody status at this point did not vitiate consent, *Watson*, 423 U.S. at 424, nor does the record contain any indication that the officers coerced Mr. Valentin into consenting.

Mr. Valentin challenges two sets of statements made by him. First, he challenges his statements that he made when he was handcuffed in the back of the patrol car, while Officer Lane stood at the trunk and was fitting the gun into the holster. Mr. Valentin stated that the holster was dusty and old, and Officer Lane responded, "[L]et's see Cinderella, let's see Cinderella" while he placed the gun in the holster. GI-1 at 27:53-28:17. Officer McCauley then exclaimed that the two fit together, while Officer Lane shouted, "Oh, come on" in apparent celebration. *Id.* at 28:06-12. We conclude that Mr. Valentin's statements at this point were not subject to *Miranda*, as he made them voluntarily, and those statements were not in response to questions, statements, or actions by Officer Lane that were reasonably likely to elicit an incriminating response by Mr. Valentin. *Innis*, 446 U.S. at 300-01. While Officer Lane's statements may have antagonized Mr. Valentin, we do not believe these statements were so antagonizing or otherwise reasonably likely to goad Mr. Valentin into saying something incriminating such that a *Miranda* warning was required — especially given the context of Mr. Valentin's constant chatter throughout his traffic stop and arrest.

However, we agree with Mr. Valentin that we must suppress his second set of challenged statements: the statements he made to both officers immediately before, and during, his transport in the patrol car. Though the body-camera footage is unclear at times and does not include the full scope of the interaction between Officer McCauley and Mr. Valentin, it reveals that Officer McCauley asked Mr. Valentin, "When you get shot?" G-1 at 35:03-06. After Mr. Valentin provided a response (which we cannot discern from the footage), Officer McCauley stated, "That's why you're carrying a gun, I get it, I get it." *Id.* at 35:07-10. Officer McCauley continued to make similar statements about the gun before he proceeded to (1) tell Mr. Valentin

15

that he would likely get in trouble because he had a holster on the front seat; and (2) verbally concur with Officer Lane that "constructive possession" would likely be the basis for Mr. Valentin's culpability. *Id.* at 35:24-54. These statements clearly were reasonably likely to elicit an incriminating response from Mr. Valentin. *Innis*, 446 U.S. at 300-01. Not only did Officer McCauley ask Mr. Valentin when he was shot, to which Mr. Valentin reasonably could have responded with incriminating information, but the officer continued to reiterate that Mr. Valentin carried a gun (which is one of the elements of the crime for which he was charged) and then — along with Officer Lane — explained the legal rationale (constructive possession) for why he satisfied this element. The officers were thus constitutionally required, under the Fifth Amendment, to administer *Miranda* warnings to Mr. Valentin prior to making these statements to him. Because they did not do so, Mr. Valentin's statements after Officer McCauley asked, "When you get shot?" must be suppressed.

## V. CONCLUSION

We deny Mr. Valentin's suppression motion with respect to (1) the evidence obtained from the car he was driving; and (2) his statements made to Officer Lane while the officer fit the gun into the holster. Such evidence and statements were not obtained in violation of the Constitution, and there is otherwise no basis to suppress them. However, because we find that Mr. Valentin's un-*Mirandized* statements to the officers immediately before, and during, his transport to the police station were obtained in violation of the Fifth Amendment, we suppress those statements.